J-S69016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.A.F.P.JR, A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.M.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2191 EDA 2019 |

Appeal from the Order Entered July 18, 2019
in the Court of Common Pleas of Bucks County,
Orphans' Court at No(s): No. 2019-A9013.

BEFORE:  SHOGAN, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:  **FILED FEBRUARY 06, 2020**

K.M.F. (Mother) appeals the order terminating her rights to her seven-year-old son, S.A.F.P. Jr. (Child), pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  After review, we affirm.

In an opinion filed on September 26, 2019, the orphans' court provided a thorough recitation of the facts and procedural history of this case.[2] Therefore, we will only briefly summarize them.  Child, born in April 2011, was removed from Mother's custody in April 2017 due to concerns about Mother's substance abuse, lack of treatment, lack of supervision and protective

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] S.P. (Father) voluntarily relinquished his parental rights.

[2] **See** Orphans' Court Opinion, 9/26/19, at 1-12.

capacity, and because of the existence of domestic violence in the home. Bucks County Children and Youth Services Agency (CYS) had received six referrals for abuse against Child committed by Mother's paramour (D.R.).[3] Child was formally adjudicated dependent in May 2017. Child was placed in the home of his maternal aunt and uncle.

At the time of Child's adjudication, CYS developed a placement permanency plan, which consisted of objectives Mother needed to fulfill in order to be reunited with Child. Specifically, the plan obligated Mother to: 1) obtain and maintain suitable housing; 2) obtain and maintain a source of income; 3) obtain a mental health evaluation and follow any and all treatment recommendations; 4) maintain regular visitation with Child; 5) submit to random urine testing; and 6) address domestic violence concerns. Over the course of the dependency case, Mother did not make significant progress toward accomplishing any of these objectives. Of note, Mother chose to remain in a violent relationship with her paramour instead of alleviating the principal concerns that led to Child's removal.

On February 5, 2019, CYS filed a petition to involuntarily terminate Mother's parental rights.[4] The orphans' court conducted evidentiary hearings

---

[3] In light of this Court's redaction of all information that might identify Child, we note that D.R. is most commonly identified as "Mr. R." in the attached orphans' court opinion. **See** Orphans' Court Opinion, 9/26/19, *passim* (redacted).

[4] In the parties' briefs and in the orphans' court opinion, there is reference to a January 2019 goal change hearing. Those specifics are not in the record.

in March 27, 2019. At the hearings, Child was represented by his guardian *ad litem*, who indicated that Child's legal interests merged with his best interests. On July 8, 2019, the orphans' court entered the order granting the petition under 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). Mother timely filed this appeal.

Mother raises the following issues for our review:

1. Did the [orphans'] court erroneously grant [CYS's] petition to involuntarily terminate the parental rights of [Mother] pursuant to 23 Pa.C.S.A. § 2511(a)(2) when [CYS] failed to prove the grounds thereunder by clear and convincing evidence?

2. Did the [orphans'] court erroneously grant [CYS's] petition to involuntarily terminate the parental rights of [Mother] pursuant to 23 Pa.C.S.A. § 2511(a)(5) when [CYS] failed to prove the grounds thereunder by clear and convincing evidence?

3. Did the [orphans'] court erroneously grant [CYS's] petition to involuntarily terminate the parental rights of [Mother] pursuant to 23 Pa.C.S.A. § 2511(a)(8) when [CYS] failed to prove the grounds thereunder by clear and convincing evidence?

4. Did the [orphans'] court erroneously move its inquiry to the needs and welfare of [C]hild pursuant to 23 Pa.C.S.A. § 2511(b) and erroneously find that termination would best meet said needs and welfare when [CYS] failed to prove grounds for involuntary termination of parental rights pursuant to the grounds alleged under 23 Pa.C.S.A. § 2511(a)(2), (5), and (8) by clear and convincing evidence?

5. Did the trial court erroneously find that the needs and welfare of [C]hild as contemplated under 23 Pa.C.S.A. 2511(b) were best met by terminating the parental rights of [Mother]?

Mother's Brief at 6.

In reviewing an appeal from an order terminating parental rights, we adhere to the following principles:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id***.; ***In re R.I.S.***, 36 A.3d 567, 572 (Pa. 2011) (plurality). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel–Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***
>
> As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

*In re I.E.P.*, 87 A.3d 340, 343–344 (Pa. Super. 2014) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that the "standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.' " *Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). Moreover, this Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). We focus our review on subsections (a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511. This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but under section 2511(b), the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

Mother argues that the conditions which led to Child's removal are in the process of being remedied. Mother's Brief at 18. Mother notes that she has cooperated in her treatment plans and improved in her communication with the foster parents. *Id.* at 19. Although Mother admits to the domestic violence concerns involving her paramour, she argues that Child was never exposed to those issues. *Id.* at 20. Finally, Mother argues that she has a worthwhile bond with Child; and that although his preference is to reside with the foster parents, Child maintained that he wanted contact with Mother. *Id.* at 29.

In response, the orphans' court has provided a thorough evaluation supporting termination of Mother's parental rights to Child pursuant to each

challenged provision, including 23 Pa.C.S.A. § 2511(a)(2) and (b). Having reviewed the notes of testimony and the certified record, we conclude that the Honorable Gary B. Gilman's findings and conclusions are supported by clear and convincing evidence of record, and we adopt Judge Gilman's opinion as our own.[5]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/6/20

---

[5] The parties are directed to attach a copy of the orphans' court opinion of September 25, 2019 to any future filings in this matter.

FILED

SEP 2 6 2019

ORPHANS' COURT

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
### ORPHANS' COURT DIVISION

IN RE:  S.A.F-P., JR.          : No. 2019-A9013

                        :
                        :

        INVOLUNTARY TERMINATION          :
        OF PARENTAL RIGHTS OF            :
        ▬▬▬▬▬▬▬▬▬▬▬▬▬         :
        ▬▬▬▬▬▬▬▬▬▬▬▬▬         :
        K.▬▬▬ M F.▬▬▬             :

## OPINION

### I. INTRODUCTION

K▬▬ F▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

(hereinafter "Appellant" or "Mother") is the biological mother of S.A.F-P. Jr., (hereinafter "Child") whose date of birth is April ▇ 2011, and who is presently eight (8) years of age. Mother has appealed to the Superior Court from our July 8, 2019 Decree granting the Petition filed by the Bucks County Children and Youth Social Services Agency (hereinafter referred to as the "Agency") to Involuntarily Terminate her Parental Rights as to Child. An evidentiary hearing which established the factual basis for our decision was held on March 27, 2019.

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

At the March 27, 2019 hearing, the following relevant facts and procedural history were established:

Victoria Kane is a caseworker for the Agency who was assigned to Child's case in May of 2017. She testified that there have been referrals to the Agency involving Child since 2015, and that the most recent referral which opened this case occurred in 2016. She stated that the

1

Agency sought an Emergency Court Order in April 2017 as a result of reports of domestic violence and substance abuse in the home and "issues with lack of supervision and Mother's protective capacities." According to Ms. Kane, both biological parents were living on Mr. R████'s property at the time and the domestic violence issues involved the "birth parents as well as Ms. Feathers and her paramour, D██ R████." (N.T. 3/27/19, pp. 27-29.)

Ms. Kane testified that an Emergency Order was issued by the Dependency Court on April 7, 2017, ███████████████████████████████████. On May 2, 2017, Child was adjudicated dependent and placed in the legal and physical custody of the Agency. Child was placed with his maternal aunt and uncle, S███ C███ and D█ M████ who are approximately thirty (30) years old, and with whom he has consistently resided ever since. (Mother is the stepsister of Mr. M████.) The Agency thereafter developed a plan for Mother's reunification with her child. (N.T. 3/27/19, pp. 30, 76-77, 87.)

The Agency's concerns for Child's reunification with Mother included the instability of Mother's housing, since she was residing at the time in a camper on a seasonal campground; Mother's unhealthy relationship with Mr. R████ and the history of violence between them; and Mother's uncertain mental health. (N.T. pp. 30-31.)

Ms. Kane met with Mother and Mr. R████ in June 14, 2017 to discuss the steps needed to achieve reunification with Child. She informed Mother that she needed to obtain stable housing, a consistent source of income in order to provide for Child, and a mental health evaluation. Mother was also advised that she needed to maintain consistent visitation with the child and submit to random drug testing. Ms. Kane stated that Mr. Rosetti was to be a part of this reunification process. (N.T. 3/27/19, pp. 31-33.)

2

Results from a June 2017 drug test indicated that Mr. R██ tested positive for THC or marijuana, but Mother's test was negative despite her previous disclosure that she had used marijuana. Mother tested positive for THC on November 21, 2017, but she had refused to be tested on September 28, 2017, which was the date of her mental health evaluation. Mother also refused to submit to a drug test on November 21, 2018, and she did not respond to Ms. Kane's request for a drug test on December 13, 2018. Ms. Kane stated that Mr. R██ did not submit to additional drug testing requested on November 21 and December 13, 2017. (N.T. 3/27/19, pp. 33-35.)

When Ms. Kane first met with Mother, she expressed the Agency's concerns about Mother's relationship with Mr. R██. She said that most of their subsequent conversations regarding reunification with her child revolved around Mr. R██, his propensity for domestic violence, and Mother's safety. Mother acknowledged that Mr. R██ had a severe alcohol problem, and although the reunification plan had included Mr. R██ up until 2018, Mother expressed indecisiveness over Mr. R██'s participation in the reunification process as a result of ongoing domestic violence in the home and Mr. R██'s failure to seek treatment for his drug and alcohol abuse. Ms. Kane eventually advised Mother that as a result of Mr. R██'s lack of compliance with the Agency's requirements, he was not approved to be part of the reunification plan, and if Mother wanted to continue with the reunification, Mr. R██ needed to be either compliant with the Agency's plan or removed from it entirely. (N.T. 3/27/19, pp. 35-39.)

Ms. Kane was queried about the goal-change hearing that was held before Dependency Court Judge Robert O. Baldi on January 14 and 15, 2019, and evidence concerning a severe knee injury Mother had sustained in February 2018. Ms. Kane said that after the injury was reported to her, she met with Mother on February 20 and March 6, 2018, and Mother related to her that the

3

injury had been caused by a violent encounter with Mr. R██ ███ wherein they had been drinking, and he pushed her. As a result, she fractured her knee, which required hospitalization. Evidence presented at the goal-change hearing revealed, however, that when Mother was treated at the hospital, she made untruthful reports to the hospital personnel that she had had an accident at home and fell down the stairs. (N.T. 3/27/19, pp. 38-41, 65.)

Neither Mother nor Mr. R██ has participated in any domestic violence counseling, although it had been discussed at the time Child came into the Agency's care. Ms. Kane noted that while she spoke to Mother on multiple occasions about the necessity for Mr. R████ o either obtain treatment or be removed from her life, Mother would simply state that follow-up conversations needed to occur with Mr. R ███, and she continued to remain indecisive about her relationship with him and his participation in the reunification process. Although Ms. Kane also had individual discussions with Mr. R███, he never followed through with any of the Agency's suggestions. (N.T. 3/27/19 pp. 42-44.)

Ms. Kane advised Mother on multiple occasions to obtain services, including therapy and mental health treatment. She said Mother received an intake assessment in November of 2018, and the first appointment was scheduled for December 12, 2018, which was approximately fifteen (15) months after the original evaluation. Ms. Kane stated that the Agency provided a third-party parenting service to Mother through Links Reunification Services, but they were a time-limited service which closed their case involvement after fifteen (15) months. Ms. Kane said that a Nurturing Parent Program began in August of 2017, which Mother successfully completed. Mother was also referred to NOVA trauma counseling, but Mother only attended one (1) session. Mother has also received services from K&S Consultants, a service referred by the Agency to work with Mother and Mr. R███ to strengthen the family. Ms. Kane testified that

4

Mother will be discharged from that service soon, due to Mother's indecision as to Mr. R████s participation in the reunification process. The caseworker eventually narrowed Agency support efforts to help Mother decide "whether Mr. R████ is going to be involved in her life and the child's." (3/27/19, pp. 45-47.)

The Agency attempted to assist Mother in finding alternative housing for Child, Mr. R████ and her through the Bucks County Housing Link Information. The only program for which Mother was eligible was Bridge Transitional Housing. The application was submitted in October 2017. However, there was a four to eight (4 to 8) month waiting list, and after the domestic violence incident involving Mr. R████ the application was updated to remove him as an applicant. Mother's application was denied in August of 2018. Ms. Kane stated that she contacted the Doylestown Women's Center, but Mother had no interest in moving to a shelter. (N.T. 3/27/19, pp. 47-50.)

Ms. Kane testified that Mother has never explicitly said to her that she is going to remove Mr. Rosetti from her life. Even after the goal-change hearing before Judge Baldi in January 2019, after which the Agency reduced Mother's visitation with Child from twice a week to once a month, Mother spoke only of spending less time at Mr. R████s residence, and has continued to live with him. Ms. Kane testified that every time she discussed reunification with Mother, she advised her that she had to decide if Mr. R████ was going to be involved in the process, and that if she couldn't make that decision, she had to decide whether to choose her son's welfare over Mr. R████ (N.T. 3/27/19, pp. 50-53, 64.)

Child has been in foster care with the maternal aunt and uncle since April of 2017, and he enjoys an affectionate, comfortable and close relationship with them. In addition, there are two (2) older adults residing in the home, with whom Child enjoys a loving, caretaking relationship.

5

Child now attends ████████ Elementary School in ████████ where he is academically on track. He has exhibited behavioral problems at school and in the foster home, but he has made significant progress since his initial placement in foster care. He has a 504 Plan at school, and daily reports are provided to the foster parents and Ms. Kane. He also receives behavioral therapeutic services through the Penn Foundation, meets bi-weekly with an occupational therapist, and spends hours in school with a behavioral specialist consultant. Ms. Kane stated that Child's behaviors have improved tremendously since starting at the school. (N.T. 3/27/19 pp. 53-56.)

On cross-examination by Mother's counsel, Ms. Kane acknowledged that Mother submitted clean drug tests on September 12, 2017 and March 6, 2018, and that Mother has been compliant in meeting with the family therapist from K&S Consultants. She also acknowledged that in the fall and winter of 2017, Mother indicated that she was overwhelmed because she was working, attending school to be a Medical Assistant, and dealing with the K&S therapist, all at the same time. Ms. Kane acknowledged that Mother has attended almost every visit with Child that the Agency has arranged. (N.T. 3/27/19, pp. 57-62.)

When queried on how Child's behavior has improved, Ms. Kane explained that when he first came into foster care, Child exhibited "a lot of toilet issues" during and after visitation with Mother. Child was also having severe temper tantrums at school and had at one point destroyed a classroom, and the school was not providing him with the specific support he needed. Child now works with a mobile therapist through Behavioral Health Rehabilitative Services, with focus on his behavioral issues at school and at the foster home. (N.T. 3/27/19, pp. 62-64.)

On cross-examination by Child's court-appointed Guardian ad Litem, Ms. Kane related that the first referral to the Agency for this family occurred in 2015 and that there have been

6

twelve (12) "ChildLine" referrals. Six (6) of those referrals involved abuse, times when Child claimed Mr. R███ injured him. Mother was aware of those six referrals. (N.T. 3/27/19, pp. 65-66.)

Ms. Kane testified that she was concerned about Mr. R███'s belligerence during and after he has been drinking alcohol. She testified that Mother revealed that at one point Mr. R███ had been drinking six (6) beers a day, and that Mr. R███ received an intake assessment at Aldie in Doylestown for alcohol treatment in October 2017. Regrettably, he did not follow through with any of the subsequent treatment recommendations. (N.T. 3/27/19, pp. 65-68.)

Despite Ms. Kane's efforts to help Mother become independent, and despite Mother's testimony at the goal-change hearing that police had been called at least five (5) times to her house for fights between her and Mr. R███, and despite reports that Mother had left Mr. Rosetti's residence at least ten (10) times, sometimes for days at a time, and that Mr. R███ has kicked her out of the house, Mother has always returned to Mr. R███, Ms. Kane stated that when she would discuss the domestic violence issue with Mother, Mother would suggest that she is partly to blame. (N.T. 3/27/19, pp. 68-70.)

Ms. Kane stated that the most recent ChildLine referral occurred in April 2018, when she received a report that a "concerning video" had been discovered on the Child's iPad. As a result of the subsequent Child Protective Services investigation, Judge Baldi issued a protective No Contact Order and a No Visitation Order for Child for approximately two (2) weeks, after which Mother was allowed subsequent supervised visitation. (N.T. 3/27/19, pp. 70-74.)

Ms. Kane confirmed that Mother testified at the goal-change hearing before Judge Baldi that Child was ruining her relationship with Mr. R███. (N.T. 3/27/19, p. 74.)

7

Pursuant to questioning by the court-appointed Child-Directed Counsel Timothy Barton, Ms. Kane testified that Child feels very safe and comfortable with his aunt and uncle. The aunt, S███ C███, is employed as an assistant teacher for toddlers at ████████████████ ████████, and the uncle, C██ M█████ works full-time for a funeral home. Ms. Kane observed that the foster parents are very protective of Child and involved in his school and activities, which include soccer, Boy Scouts and fishing. They reside in ████████████ ████████████████████████████████████ Montgomery County, and Child enjoys spending time outdoors. The two older adults who own and reside at the residence are E██ S███ and her husband, who are in their 70's. Ms. Kane testified that the S███s are completely supportive of the foster care placement and want Child to reside with them as long as possible. (N.T. 3/27/19, pp. 76-81.)

Ms. Kane described the visitation schedule that was established for Mother and Child during the two years he has spent in foster care. Mother initially had a supervised visit once a week which was increased to twice a week in June of 2017. In October 2017 Mother was granted unsupervised visitation, which continued until June of 2018, when she was again placed on supervised visitation due to reports the Agency received. Mother resided with Mr. R███ at the time and she understood that he was not permitted to attend the visitations. (N.T. 3/27/19, pp. 81-83.)

Pursuant to a Dependency Court Order, Mr. R███ was to have no contact with Child, and he was required to undergo a Risk Assessment Evaluation, which he failed to do. Ms. Kane stated she had multiple conversations with Mother in which she advised her that Mr. R███ was an obstacle to her reunification with Child, but Mother was very defensive and angry, and at one point stated that they (the Agency) should "just keep the child." Ms. Kane said that despite the

8

"multiple productive conversations" she had with Mother suggesting she extricate herself from her relationship with Mr. R████ Mother would shortly afterward resume living with him. (N.T. 3/27/19, pp. 84-86.)

Corey Asner is a family therapist employed by K&S Consultants, which provides a therapeutic support program to families referred by the Agency. She testified that on August 3, 2017, she was assigned to work with Mother on reunification with Child. She initially met with Mother once a week, and Child would be involved every other week. She stated that initially Mr. R████ was to be part of the reunification process, but due to his noncompliance and uncooperative attitude, his involvement was terminated. (N.T. 3/27/19, pp. 88-92.)

Ms. Asner testified that her initial focus was on rebuilding Mother's parenting relationship with Child, but that she shifted to working on Mother's mental health, including her anger, depression and relationships with Child and the foster parents. She said the clear expectation was for Mother to obtain a safe and stable environment for Child, and for Mother to make the choice of either her child or Mr. R████. She stated that despite those expectations, Mother struggled with that decision. (N.T. 3/27/19, pp. 92-94.)

Ms. Asner testified that Mother appeared at their sessions on two (2) occasions with physical injuries. The first occurred on February 20, 2018, when Mother had on a leg brace and related to her that she had had an altercation with Mr. R████. In the second incident, on July 13, 2018, Mother had a bruised eye, which she related was due to another altercation with Mr. R████ Despite their conversations concerning her safety and the traumatic impact these events were having on Child, Ms. Asner noted that Mother did not pursue the recommendations to seek the assistance of the women's shelter, and Mother eventually returned to Mr. R████ (N.T. 3/27/19, pp. 94-97.)

9

On cross-examination by Mother's counsel, Ms. Asner said she believed that Mother had made progress on some of the goals of the treatment plan, including improved self-confidence and communication with the foster parents, but was still working through the issues with domestic violence and safety. She related that Mother appeared to have a positive and loving relationship with Child. (N.T. 3/27/19, pp. 97-100.)

The next witness at the March 27, 2019 evidentiary hearing was Mother. She testified on direct examination that she has been employed by Giant for eight (8) years and works twelve (12) hours a week, which is not enough to sustain herself. She has obtained additional employment as a housecleaner earning Sixty dollars ($60.00) every other week, and also started employment at Turkey Hill on March 1, 2019, where she expects to work twenty to twenty-five (20 to 25) hours per week. (N.T. 3/27/19, pp. 101-108.)

Mother testified that she is again on the waiting list for housing with the Bridge Program. She stated her initial application for the program was denied because she wasn't working enough. She stated that in order to obtain more stable housing in the interim, she and Child can reside at her friend Sara's house. (N.T. 3/27/19, pp. 108-111.)

Presently, Mother sees a psychiatrist at Penn Foundation every month for her mental health treatment, and prescribed medication has improved her depression. She has also started with a Recovery Coach, who helps her with "everything," including housing. (N.T. 3/27/19, pp. 111-112.)

During Mother's two-hour unsupervised visits with Child, they would go to the park and visit his eighteen-year-old sister. When asked about the evidence of Mr. R████'s noncompliance with the reunification process, Mother stated that she has asked him numerous times to comply, but "can't make him do anything." She stated she wants him to be part of the process, but that it

10

is "very hard" for her and she "doesn't want to pick a man over my son." (N.T. 3/27/19, pp. 112-114.)

Mother acknowledged on cross-examination that she has been told repeatedly that she has to make a choice between her son and Mr. R██████, and that she has been advised repeatedly that it is not safe to have Mr. R██████ in the presence of Child. She stated, however, that "that was happening when there was drinking going on," and she insisted he is no longer drinking. When asked why Mr. R██████ was absent from this hearing, she said she was advised that he should not attend. She confirmed that she has not made a decision to "move on" from Mr. R██████. (N.T. 3/27/19, pp. 114-117.)

On cross-examination by Ms. Horne, the Guardian ad Litem, Mother acknowledged that she was aware that Child has made multiple disclosures of abuse by Mr. R██████. She denied that Child told her that Mr. R██████ "calls him a little fucker, stupid, and nigger, spic, Puerto Rican," but Mother acknowledged that she heard that testimony at the goal change hearing in January. She denied that the Penn Foundation had found her housing, and that she told the case manager that it was not what she was looking for. She admitted that she told Child that he is a liar in reference to a disclosure he made in April regarding Mr. R██████ but denied telling him that he was ruining her relationship with Mr. R██████. When questioned as to her inability to take the most significant step and leave Mr. R██████, she acknowledged that she has not left him but insisted that she "had done everything that you guys (the Agency) have asked me to do." (N.T. 3/27/19, pp. 117-121.)

On cross-examination by Mr. Barton, Mother said she had been living with Mr. R██████ for three-and-one-half (3½) years. She acknowledged that Mr. R██████ had a severe drinking problem during that time, and that it had not been a good environment for Child. When asked if

11

she would agree that it would not only be a bad situation for Child to live with her and Mr. R████, but that reunification with Child would also not be ideal as long as she maintained her relationship with Mr. R████, she replied "Yes and no." (N.T. 3/27/19, pp. 121-123.)

While acknowledging that she was very frustrated by Mr. R████'s noncompliance with the reunification process, Mother admitted that she still wanted Mr. R████ to be part of the family structure, although she also admitted that it has not been, and would not be, a safe environment for Child. (N.T. 3/27/19, pp. 124-126.)

As the Child-Directed Counsel for Child, Mr. Barton noted at the March 27, 2019 hearing that he had reviewed the entire case, met with the appropriate parties, and believed that he had established an appropriate attorney-client and personal relationship with Child. He related that Child wanted him to state to the Court that Child wished to continue living with his aunt and uncle in their residence, where he felt comfortable and safe, and which he now considered his home. He said Child acknowledged that there have been problems with his behavior, but appreciates the therapies and opportunities available to him, and believes he is doing much better. Child related to him that he enjoys school and wants to remain there, but Child also stressed that he misses his mother and expressed a desire for increased visitation with her. Child also asked if he could see his father more often. (N.T. 3/27/19, pp. 126-131.)

On July 8, 2019, after careful consideration of this matter, this Court entered a Decree granting the Agency's Petition for Involuntary Termination of Parental Rights and Duties, which terminated Mother's parental rights as to Child.

On August 1, 2019, Mother filed a timely appeal to the Superior Court of Pennsylvania from our Decree of July 8, 2019.

## III. APPELLANT'S STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Appellant's Notice of Appeal was accompanied by a Concise Statement of Matters complained of on Appeal pursuant to Pa. R.A.P. 1925(a)(2), which is repeated, *verbatim*, as follows:

1. The trial court erroneously granted Bucks County Children & Youth Social Services Agency's (hereinafter referred to as "Agency") petition to involuntarily terminate the parental rights of Appellant pursuant to 23 Pa. C.S.§ 2511(a)(2) when the Agency had failed to prove the grounds thereunder by clear and convincing evidence.

2. The trial court erroneously granted the Agency's petition to involuntarily terminate the parental rights of Appellant pursuant to 23 Pa. C.S. § 2511(a)(5) when the Agency had failed to prove the grounds thereunder by clear and convincing evidence.

3. The trial court erroneously granted the Agency's petition to involuntarily terminate the parental rights of Appellant pursuant to 23 Pa. C.S. § 2511(a)(8) when the Agency had failed to prove the grounds thereunder by clear and convincing evidence.

4. The trial court erroneously moved its inquiry to the needs and welfare of the children pursuant to 23 Pa. C.S. §2511(b) and erroneously found that termination would best meet said needs and welfare when the Agency had failed to prove grounds for involuntary termination of parental rights pursuant to the grounds alleged under 23 Pa. C.S. §2511(a)(2), (5) and (8) by clear and convincing evidence.

5. The trial court erroneously found that the needs and welfare of the child as contemplated under 23 Pa. C.S. §2511(b) were best met by terminating the parental rights of Appellant.

## IV. DISCUSSION

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis, as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated

13

in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1215 (Pa.Super. 2015) citing *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

Here, Appellant has challenged the Agency's termination of her parental rights pursuant to §2511 (a)(2), (5), and (8), which provide, in pertinent part, as follows:

(a) General rule. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

As the party seeking termination, the Agency bore the burden of establishing by clear and convincing evidence that grounds existed for terminating Mother's parental rights. Clear and

14

convincing evidence means testimony that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re M.M.*, 106 A.3d 114, 117 (Pa.Super. 2014) (internal citations omitted).

"[T]he complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child." *In re C.P.* 901 A.2d 516, 520 (Pa.Super. 2006). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances," and "only upon a showing of clear necessity." Even when such intrusion is necessary to protect the child, every possible effort must be made to reunite the family. In addition, all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. A parent's performance must be measured in light of "what would be expected of an individual in circumstances which the parent under examination finds himself (or herself)." *In re Matsock*, 611 A2.d 737, 742-743 (Pa.Super. 1992) (internal citations omitted).

In reaching a decision following a termination proceeding, the trial court's initial focus is on the conduct of the parent and whether his or her conduct justifies termination of parental rights pursuant to the pertinent statutory provisions. *In re B.L.L.*, 787 A.2d 1007 (Pa.Super. 2001). Only if the statutory grounds for termination are established, pursuant to §2511(a), does the welfare of the child become the court's paramount consideration, and the court must reflect on whether termination will best serve the child, focusing on the developmental, physical, and emotional needs and welfare of the child pursuant to §2511(b). *In re L.M.*, 923 A.2d at 511.

Following the hearing in the present case, and upon careful consideration of all of the testimony and evidence presented, we determined that the Agency met its burden of

15

demonstrating clear and convincing evidence in support of the termination of Mother's parental rights.

## A. THE AGENCY PRESENTED CLEAR AND CONVINCING EVIDENCE IN SUPPORT OF TERMINATING THE PARENTAL RIGHTS OF MOTHER PURSUANT TO SECTIONS 2511(a)(2), (5), and (8) OF THE ADOPTION ACT

It is clear that in a termination proceeding, the initial focus is on the conduct of the parents. *In re A.D.*, 93 A.3d 888, 896 (Pa.Super. 2014). The statute does not require aggregate conditions of incapacity, abuse and neglect in order for a court to terminate parental rights. Rather, the statute clearly states one condition is sufficient. If the court finds that there is clear and convincing evidence to establish that the probability of a parent performing his or her parental duties is very low, the court may terminate parental rights. *In re Z.P.*, 994 A.2d 1108, 1126 (Pa.Super. 2010).

### 1. Termination of Mother's Parental Rights is Warranted Pursuant to §2511(a)(2)

Pursuant to Section 2511(a)(2) of the Adoption Act, termination of parental rights is permissible if the following three elements are met:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

> The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002) (citations omitted).

*In re Adoption of C.D.R.*, 111 A.3d at 1216.

16

In the instant case, the Agency has alleged that Mother is incapable of parenting Child. In order to terminate the parental rights of Mother, the court must not only find incapacity, but it must also find that the conditions which cause Mother's incapacity are irremediable. We determined that the Agency did present clear and convincing evidence which not only established Mother's incapacity, but also demonstrated her inability to remediate the conditions that warranted the termination of her parental rights.

The testimony of the Agency caseworkers revealed that the first referral to the Agency involving these parties occurred in 2015 and that there had been twelve (12) subsequent referrals, six (6) of which involved claims of abuse of Child by Mother's paramour, Mr. R████, and of which Mother was plainly aware. Furthermore, the referral which opened the present case occurred in 2016, and the most recent referral occurred in April 2018, after Child had already been removed from Mother's custody in April 2017. The testimony presented at the hearing convinced this Court that, unfortunately, Child was clearly in danger when he was in the presence of Mr. R████. It also revealed that although Mother wanted Mr. R████ to be involved in the reunification process, his behavior and conduct demonstrated that he did not want to be part of that process, and he continually refused to meaningfully participate in the reunification of Mother and Child. Mr. R████ would not take the necessary actions or follow suggestions to remediate his violent behavior in order to establish a safe and nurturing environment in which Child could grow up. This Court was convinced that, to the contrary, Child would be exposed to frequent danger and denigration while in Mr. R████'s presence.

This Court further observed that Mother had exhibited a significant amount of instability in her life, including unstable housing arrangements and mental health issues. Although she had made some efforts to remedy this instability and was receiving some treatment for her mental

health, Mother had not pursued with appropriate vigor the goal of securing and maintaining stable housing for Child and herself. She had apparently dismissed alternative housing that had been offered to her, and appeared incapable of appreciating the necessity for providing a stable home environment for her son. Mother appeared more interested in returning to her cohabitation with Mr. Rosetti than in establishing a stable home for Child and herself.

The most regrettable aspect of Mother's relationship with her child was her undeniable and continuing inability to choose her son over Mr. R███ and her failure to reject the tumultuous, unstable and violent relationship she shared with him. While Mother had been severely physically injured by Mr. R███ on at least two (2) occasions of which the caseworkers were aware, while the police had been called numerous times to Mr. R███'s residence to diffuse altercations between them, and while she acknowledged that such an environment would have a traumatic effect upon Child, Mother continued to be completely incapable of extricating herself from her abusive and harmful relationship with Mr. R███. Although Mother has been continually advised by everyone who worked with her and offered support and therapeutic services over the last several years that she must cease her relationship with Mr. R███ if she is to be reunited with her son, she has refused to do so.

We also noted that Mother has created excuses for her physically violent and inappropriate relationship with Mr. Rosetti by suggesting that she was partly to blame for the violent encounters with him, and by insisting that he no longer consumed alcohol. We did not find such testimony convincing.

Mother's repeated and continued refusals to cooperate with reasonable Agency objectives which require her to terminate her relationship with Mr. R███ clearly and convincingly demonstrated her incapacity to consistently perform parental duties over a significant period of

18

time. It is revealing that Mother would continually place herself in a situation in which she would have to apologetically explain that she "doesn't want to pick a man over my son." Mother has denied Child the parental care necessary for his physical and mental well-being by permitting his continued exposure to the physical and mental abuse foisted upon him by Mr. R████, and then by failing to take the steps necessary to protect him from that abuse. Such continuous incapacity and refusal clearly and convincingly warrants termination of Mother's parental rights.

**2. Termination of Mother's Parental Rights is Warranted Pursuant to §2511(a)(5)**

The Agency was able to prove clearly and convincingly, pursuant to §2511 (a)(5), that Child has been in care for six (6) months or more after removal from Mother's care by Dependency Court, that the reasons for such placement continue to exist, and that those reasons are not likely to be remedied within a reasonable time.

Decisional law instructs this Court to evaluate the individual circumstances of a case, and consider all explanations offered by the parent facing termination of his or her parental rights when determining if the evidence, in light of the totality of circumstances, clearly warrants involuntary termination. *In re R.I.S.*, 36 A.3d at 572. Based on the evidence and testimony provided regarding Mother's circumstances, and in accordance with the pertinent statutory and decisional law, we found that Child has lacked the proper parental care and control necessary for his well-being on a continuing basis, per §2511 (a)(5).

We incorporate our factual recitation in Sections II and III A 1., *ante*, into this section of our Opinion. Based on the testimony we heard not only from Agency witnesses, but from Mother herself, we determined that Mother has not adequately remedied her parental incapacities so as to appropriately be able to provide and care for Child. Unfortunately, the evidence is clear and convincing that she cannot and will not remedy those conditions within a reasonable time period.

19

### 3. Termination of Mother's Parental Rights is Warranted Pursuant to §2511(a)(8)

The Agency also met its burden of proving, pursuant to §2511(a)(8), that Child has been in care for at least twelve (12) months, as Child was placed in the Agency's care in April 2017, after removal from Mother's care by the Dependency Court. The additional requirement set forth in §2511(a)(8), that the conditions which led to the removal or placement of the child continue to exist, has been detailed in the preceding sections of this Opinion.

In addition, the Court must determine that termination of parental rights would best serve the needs and welfare of the child. As discussed above, this Court determined that removal of Child from Mother's care was necessary to protect him from the present and continuing abuse that he experienced from Mr. R██████ and from which Mother was unwilling and incapable of protecting him. It was also clear that Child had been placed in a safe, comfortable and loving environment with his foster parents, D██ M█████ and S██ C████, and the S████s, who own the farm house in which he resides and now considers his home. Child has expressed that he wants to remain with his foster parents. Moreover, Child has expressed his appreciation for, as well as his desire to remain, in his current school, and he is receiving the necessary therapeutic services and treatment that are resulting in improvement in his behavior and overall well-being.

The Agency clearly and convincingly established the criteria set forth in 23 Pa.C.S. §2511(a) (2),(5), and (8) for termination.[1] Accordingly, we next examined, pursuant to Issue Numbers 4 and 5 of Mother's Concise Statement of Matters, along with 23 Pa.C.S. §2511(b), whether the termination of Mother's parental rights serves the best interests of Child, considering his developmental, physical, and emotional needs and welfare. We found that it does so.

---

[1] We reiterate that the Superior Court need only agree with the trial court's decision as to any one subsection of §2511, in order to affirm termination of parental rights. *In re M.M.,* 106 A3.d 114.

20

## B. TERMINATION OF MOTHER'S PARENTAL RIGHTS IS WARRANTED PURSUANT to §2511(b) of the ADOPTION ACT

As noted above, Child has resided with his present foster parents, S███ C███ and D███ M███, who is Mother's stepbrother, since April 2017. Ms. C███ and Mr. M███ are very loving and attentive to Child, and involve him in many activities including soccer, Boy Scouts and fishing. In addition, the S███s, the older couple who own the farmhouse in which they all reside, are very receptive and welcoming of Child, and they wish for him to remain in their household.

Child does not have special medical needs, but as a consequence of the disruptive and destructive behavior he has exhibited at school, he is receiving wraparound services through Penn Foundation, as well as mobile therapy from Behavioral Health Rehabilitative Services, along with other behavioral specialist and therapeutic support services. Ms. Kane testified that Child's behavior has improved over time, apparently due in part, to participation in these services.

We also noted that Mr. Barton, the court-appointed legal-interests counsel for Child, expressed on behalf of Child that although he misses his mother and wished for increased visitation with her, Child appreciates his current placement with Ms. C███ and Mr. M███ and wishes to remain in their household, which he now considers his home. Child acknowledged that he has exhibited behavior problems, but apparently appreciates the therapy and opportunities he has received, and believes he is doing much better. In addition, Child enjoys the school he is currently attending, and wants to remain there. Clearly, Child is improving if not thriving in his current placement.

21

When considering what situation will best serve a child's needs and welfare, the trial court must examine the status of the natural parental bond and whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial to the child.

> When conducting a bonding analysis, the court is not required to use expert testimony. ..Social workers and caseworkers can offer evaluations as well... Additionally, Section 2511(b) does not require a formal bonding evaluation... "Above all else ... adequate consideration must be given to the needs and welfare of the child."... A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ..
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Z.P.*, 994 A.2d 1108, 1121 (internal citations omitted).

In this matter, we observed that the termination of Mother's parental rights advanced by the Agency was supported by Mr. Barton in his capacity as Child-Directed Counsel for Child. Mr. Barton offered the Court insight into Child's positive feelings for his foster parents, his residence and his school. Although Child still maintained a natural bond with Mother, as exhibited by his desire for increased visitation with her, he nevertheless clearly appreciated his current circumstances and wished to convey to the Court his desire to remain permanently with his aunt and uncle, whom he apparently readily accepted as the important decision-makers in his life. Child also professed his desire to continue his attendance at his school, ████████ Elementary, where he was progressing academically and where he received behavioral

22

rehabilitative and therapeutic services, which he recognized were responsible for improvements in his behavior and well-being.

Our appellate courts have long held that parental bonds may be properly terminated "...when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimal parental care to which that child is entitled." *In re: J.W.*, 578 A.2d 952, 958 (Pa.Super. 1990).

Mother's ambivalence regarding the choice of continuing to live with Mr. R████, her paramour, whom she acknowledges becomes verbally and physically abusive when he drinks alcohol, versus leaving him and independently caring for her son, is palpable. Mother agrees that it would be a "bad situation" for Child to live with Mr. R████; she understands it would be unsafe for Child as well as for her. Yet, Mother has chosen to continue to live with Mr. R████, a situation which is untenable for Child. Mother's actions and failure to act, then, speak volumes about her parenting choices.

After balancing considerations of Mother's continuing inability to remedy her parental incapacities which have repeatedly subjected Child to instances of neglect and abuse, against Child's needs for permanence and stability, this Court appropriately concluded that it was in the best interests of Child to grant the Agency's Petition to Terminate Mother's Parental Rights.

## V.    CONCLUSION

Mother has long-placed herself in the unenviable position in which she has been required to make a decision as to whether she can achieve reunification with her son or continue her relationship with her abusive paramour. While we do not doubt that Mother loves Child, her inability to make the decision to do what is best for her son speaks volumes as to her incapacities as an adequate parent. For all of the reasons noted above, then, we respectfully submit that our

23

Decree of July 8, 2019, granting the Agency's Petition to Involuntarily Terminate Mother's Parental Rights, should be affirmed.

BY THE COURT:

9/25/19
Date

GARY B. GILMAN,                    J.

24